## THE WYOMISSING.

(District Court, E. D. New York. August 3, 1906.)

COLLISION—TOW AND ANCHORED DREDGE—UNNECESSARILY OBSTRUCTING CHANNEL.

A tug, with a tow of 23 boats in tiers, the whole 1,000 feet long and 100 feet wide, with helping tugs on the sides, passing through the Arthur Kill in the night, *held* not in fault for a collision between one of the rear boats in the tow and a dredge engaged in dredging the channel, which had been breasted off toward the Staten Island shore for the night, a distance of about 50 feet from the side of the dredged channel; it appearing that it could have safely moved 60 feet further toward the shore, and therefore needlessly obstructed the passage of vessels and left insufficient room for such a tow to pass, in view of the reverse tide in the Kill.

In Admiralty. Suit for collision.

Carpenter, Park & Symmers, for libelant.
Armstrong & Brown, for claimant.

THOMAS, District Judge. This action involves a collision, between 4 and 5 o'clock on the morning of November 10th, of a tow in charge of the tug Wyomissing and the starboard side of libelant's dredge No. 7, lying westerly of the Elizabethport Ferry, in the Arthur Kill. There were two helping tugs on the starboard side of the tow. The dredge had on November 9th been working in the most southerly cut, No. 1, and finished at about 6 p. m., when it was breasted off towards Staten Island.

Ittman, the United States inspector, could only say that it moved, but did not give the distance. It moved itself, without the usual aid of the tug General Newton. Moriarity, the captain of a tug, was near dredge No. 2, 1,000 feet away, and saw it moved, and saw it the next morning. He stated that it "went in 50 or 100 or 75 feet," and that it was within about 75 feet from the bank, and that there was no scow alongside of it. He also says that a tow going east would have 450 feet from the dock, and that there was from 350 to 400 feet of water between the bar on the north shore and the dredge. The actual distances are stated below.

Clancy, the master of the tug Bouker, states that he was at the dredge at 7:30 p. m., and that it was 75 feet off the Staten Island shore, and that it had moved from 25 to 50 feet out of the cut, and could not have gone farther to the southward; that it would take 10 minutes to take up the spuds; and that with the Bouker he could tow it 3 miles per hour against the tide. Taylor, the president of the libelant, saw the dredge November 9th at about 7 o'clock p. m. He states that it was then some 200 feet west of the ferry and 80 feet off shore; that the

dredge drew from 9 to 10 feet; that it had no scow; and that it was not possible to get the dredge farther towards the Staten Island shore, as there was not more than 10 feet of water south of where the dredge lay.

Savage, who was the master of a local tug, stated that a strong tug like the Bouker could tow the dredge, but that a small tug like the General Newton could not tow it to the northerly shore; that scows of the Taylor Dredging Company and dredges tie up at the pipe dock on the northerly side; and that the Bouker could shift it to that place about as quickly as he could breast it off. But Taylor, president of the libelant company, stated that he was not allowed to use this dock. It appears from the evidence of this witness, as well as others, that at the point where the dredge lay, the flood tide towards the Staten Island shore, a bar ran out from the northerly shore about 200 feet. Savage states that it was a hard place to get by, in which he is confirmed by the claimant's evidence and disputed by libelant's evidence. That question is discussed later.

Carolsen, who was on dredge No. 7, stated that it moved about 50 feet towards the Staten Island shore, and 70 or 80 feet therefrom; that if it had gone farther it would have gone aground; that he pulled the spuds up flush with the bottom. Lee, the cook of the dredge, stated that the dredge was 200 feet west of the Staten Island Ferry; that the dredge was breasted off 50 to 75 feet from the cut, and was from 60 to 70 feet away from the shore. Peterson, deckhand on dredge No. 7, stated that he helped breast in the dredge; that it went towards the shore; that the spuds were taken up, the dredge warped over, and the spuds dropped again. Peterson did not know much about distances, nor did Neilson, who was on the dredge, and stated that it moved 70 or 80 feet, and was 80 to 100 feet from the shore. Thompson, on the dredge, stated that it breasted over from 50 to 60 feet from where it left off work and was 80 feet from shore.

Scott, captain of the Wyomissing, not on duty at the time of the collision, said that going westerly at 7:30 the evening before he passed between the dredge and Staten Island; that it had a scow on its port side; that there was 150 feet of clear water south of it; that the Wyomissing draws 13 feet 6 inches; that he stopped and asked some one on the dredge, if he was going to move but received no answer. He stated that to pass the dredge safely he needed 25 to 30 feet more room than he had, and that in ordinary navigation at low water he came with his tug within 50 feet of the meadows; that if the dredge were not there he could keep within 50 feet of the meadows with his tow coming up; that he had seen Taylor's dredges at the pipe dock.

Scheid, the pilot in charge of the Wyomissing at the time of the collision, stated that his tug had the hawser, while there were two tugs on the starboard side of the tow. He confirmed the evidence of Scott as to passing the dredge going down at 7:30 on the previous night. He stated that the Wyomissing, at the time of the collision, passed 150 feet off the dredge, the first tier of boats passed about 20 to 30 feet, the second tier 18 feet, the third tier 8 feet, and the fourth tier 6 feet; that the fifth tier collided; that the tug Ashbourne was shoving on the

starboard side of the third tier, and that the Pencoyd had backed away from the tow at the time of the collision.

Powers, the pilot of the helping tug Ashbourne, stated that he went down light between noon and 5 p. m. of the night before; that the dredge was in the middle of the channel; that when he came back he went alongside of the fourth tier; that the fifth tier passed the dredge 15 to 20 feet, and that the Ashbourne, did not clear over 4 or 5 feet; that the Pencoyd dropped off to avoid the dredge. It appears that there were six tiers of boats, four boats in five tiers, and three boats in the last tier. This witness states that 300 feet of clear water was needed to take the tow past the dredge.

Halpin, pilot of the Transit, stated that he passed the dredge going down at 1 or 2 o'clock a. m.; that the dredge had a scow on its port side. He stated that he had been within 25 feet of the Meadows with a tow drawing 11½ feet at half tide; that at low tide there was 2½ feet less water than at half tide; that the dredge was 200 feet off the Staten Island shore, and the scow on its port side 150 feet off such shore; that the dredge on its starboard side, was from the New Jersey shore 390 or 400 feet, "something like that." "Q. So that there was 400 feet, or how many feet, to navigate in there between the Jersey shore and the side of the dredge? A. No, sir; we had Elizabethport bar to contend with. We didn't have that much clear water. We couldn't go over that bar."

O'Toole, captain of the Pencoyd, testified that he was pushing on the fifth tier, but necessarily backed away when within 25 feet of the dipper of the dredge; that the dredge was lying 150 or 175, maybe 200, feet off the Staten Island shore, which would leave 200 feet between it and the New Jersey shore.

There is the usual conflict. The libelant insists that the dredge without a scow was as far to the Staten Island shore as possible, while the claimant declares that the dredge and its scow were near the middle of the channel, and had not moved from 7:30 o'clock of the evening previous. The blue print, "Exhibit No. 1," offered by the libelant shows that the new channel, opposite the point where the dredge lay at the time of the collision, was 300 feet wide, the distance to the dock line on the New Jersey shore 100 feet, the distance from the south line of the cut to the shoal line on the Staten Island shore about 150 feet, the greatest width of the bar on the New Jersey shore from the north side of the new channel as projected was 100 feet, and the distance from such point of the bar to the shoal line on the Staten Island side about 300 feet, and the distance from the point where the starboard side of the dredge lay, which is found to be 50 feet outside the southerly line of the channel, westwardly and parallel to such line, to a point opposite the point of the bar, was 325 feet, and the distance between such last point and the nearest part of the shoal was about 250 feet.

The evidence is vague as to the dimensions of the dredge, but there is some suggestion that it was 42 feet wide and 75 feet long. Whether that includes the overhang of the bucket does not appear. The tow was about 1,000 feet long, and, except the last tier, probably 100 feet wide, and the helping tugs were to the starboard, occupying additional

space. Therefore the problem was to take, on a strong flood tide setting towards Staten Island from Elizabethport river, a tow 1,000 feet long and 100 feet wide with helping tugs on the outside thereof, through a piece of water 300 feet wide at its westerly end, 450 feet wide on the easterly end, where the dredge lay, with a distance of 325 feet between such easterly and westerly ends, with the consideration that the tow must be kept off a dredge of the size named, and yet not be carried onto the projecting bar or New Jersey docks, where boats customarily are lying. It is true that at the point where the dredge was lying there was 450 feet on its starboard side, but 325 feet westerly this space was reduced to 300 feet between shoal points. That was a contracted space through which the tow must pass to utilize the ampler space north of the dredge. After the tow passed Elizabethport river the tide set right towards the dredge, and after the tug passed the dredge easterly about 1,000 feet to Dooley's Point the tide set towards the New Jersey shore, against which the towing tug must guard, lest it be driven upon the docks or whatever might be lying there.

This reversing tide was a matter to be taken into account. The navigator had the point of the shoal on his port side, and 325 feet easterly on his starboard side the dredge, so that an oblique line between such obstructions shows about 400 feet, not counting the length of the dredge.

The dredge moved out from the new cut not more than 50 feet. Some of the libelant's witnesses make the estimate less. But the map shows that there was room to move out 150 feet before reaching shoal water. The dredge was 42 feet in width. It moved towards shore 50 feet. That left 150—92, or 58 feet of water before reaching the shoal that the dredge did not utilize. Hence it unnecessarily reduced the passage by that distance. Taking into consideration the difficulties of the situation and the unnecessary obstruction of the dredge, the libelant does not fulfill the burden of proving that the collision was caused by any fault of the tug, or that the tug negligently contributed to the injury. The dredge had daylight and ample time to move out of the way. The tug had night, adverse tides, and uncertainty to confuse, and obstructions on either side to avoid; and it is deemed unjust to condemn her.

The libel will be dismissed.